IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| LINDSAY WARD, | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO. 6:19-cv-00337** |
| **TEXAS FARM BUREAU, TEXAS FARM** | § | |
| **BUREAU BUSINESS CORPORATION,** | § | **JURY TRIAL DEMANDED** |
| **TEXAS FARM BUREAU CASUALTY** | § | |
| **INSURANCE COMPANY, TEXAS** | § | |
| **FARM BUREAU MUTUAL** | § | |
| **INSURANCE COMPANY, TEXAS** | § | |
| **FARM BUREAU UNDERWRITERS,** | § | |
| **FARM BUREAU COUNTY MUTUAL** | § | |
| **INSURANCE COMPANY OF TEXAS,** | § | |
| **SOUTHERN FARM BUREAU LIFE** | § | |
| **INSURANCE COMPANY, SLOAN** | § | |
| **BROWN, JUSTIN INGRAM, and JON** | § | |
| **SHARP,** | § | |
| | § | |
| **Defendants.** | § | |

# PLAINTIFF'S ORIGINAL COMPLAINT & JURY DEMAND

## INTRODUCTION

Plaintiff Lindsay Ward brings this case against Farm Bureau for wrongful retaliation. Farm Bureau fired her after she refused to perjure herself in an affidavit Farm Bureau wanted to use to help defend against a lawsuit to recover overtime. Ward was one of Farm Bureau's agency managers when her colleagues sued Farm Bureau for unpaid overtime under the Fair Labor Standards Act. That case, which involves many of the same Defendants, is pending before the Court. *See Ferguson v. Texas Farm Bureau, et al.*, Cause No. 6:17-cv-111-RP. In *Ferguson*, agency managers, like Ward, moved for conditional certification of a collective action under the

FLSA—alleging they were categorically misclassified as exempt independent contractors and not paid overtime. To help oppose conditional certification, Farm Bureau solicited "happy camper" affidavits from their agency managers that distorted the mangers' working conditions to seem more independent. Ward received her pre-drafted "happy camper" affidavit one afternoon and was instructed to sign it by 5:00 p.m. that same day. A member of her agency's county board even called her and warned that, according to Farm Bureau superiors, if she did not sign the affidavit she would be terminated within 30 days. Ward reviewed the affidavit and found it was misleading and false. She refused to lie about her working conditions and did not sign. True to its threat, Farm Bureau fired her about a month later.

While this case is also about overtime, this case concerns an existential threat to a law designed to guarantee qualified employees minimum wage and overtime. The FLSA depends on employees voicing their complaints at work and enforcing their rights in court. As the Supreme Court has recognized, the FLSA enforces wage, hours, and overtime standards not through continuing detailed federal supervision or payroll inspections but upon information and complaints received from employees seeking to vindicate rights their employers denied. *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 11–12 (2011). The FLSA's antiretalition provision makes this enforcement scheme possible by preventing fear of economic retaliation that would otherwise induce workers to quietly accept substandard conditions. *Id*. Farm Bureau fired Ward for not perjuring herself in a way that imperiled her own rights under the FLSA and misled the Court deciding the case of agency managers who would not quietly accept Farm Bureau's working conditions. Farm Bureau's retaliation violates the FLSA.

**SUBJECT-MATTER JURISDICTION AND VENUE**

1.      This Court has jurisdiction over the subject matter of this action under 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

2.      Venue is proper in the Western District of Texas because a substantial portion of the events forming the basis of this suit occurred in this District.

**PARTIES AND PERSONAL JURISDICTION**

3.      Plaintiff Lindsay Ward is an individual residing in Polk County, Texas.

4.      Defendant Sloan Brown is an individual residing in McLennan County, Texas. Brown is Texas Farm Bureau Insurance's Vice President of Sales for the State of Texas. He has hiring and firing power for agency managers in Texas. Brown also directed the agency manager's (including Ward) working conditions. Upon information and belief, Brown was involved in the decision to terminate Ward in retaliation for refusing to sign a false affidavit in support of Defendants' overtime case in *Ferguson*. Upon information and belief, Brown also exercised discretion over agency manager's compensation (including Ward) by requiring managers to transfer commissions from their book of business to new agent hires. Furthermore, upon information and belief, Brown dictated the manner in which agency managers (including Ward) were to run the agency, including the relationship with the local Farm Bureau County Board and agent sales requirements. . Upon information and belief, Brown maintains employment records, including email related to Ward and other agency managers

5.      Defendant Justin Ingram is an individual residing in McLennan County, Texas. Ingram is one of two regional sales managers in charge of the State of Texas, and directly reports to Sloan Brown. Ingram has hiring and firing power for agency managers in his region in Texas,

including Ward. Ingram also directed the agency managers in his region's (including Ward) working conditions. Ingram, along with Jon Sharp, personally terminated Ward in retaliation for refusing to sign a false affidavit in support of Defendants' overtime case in *Ferguson*. Upon information and belief, Ingram also exercised discretion over agency manager's compensation (including Ward) by requiring managers to transfer commissions from their book of business to new agent hires. Furthermore, upon information and belief, Ingram dictated the manner in which agency managers (including Ward) were to run the agency, including the relationship with the local Farm Bureau County Board and agent sales requirements. Upon information and belief, Ingram maintains employment records, including email related to Ward and other agency managers.

6.      Defendant Jon Sharp is an individual residing in Wharton County, Texas. Sharp is a district sales manager in charge of many counties in Texas and is directly reports to Justin Ingram and Sloan Brown. Sharp has hiring and firing power for agency managers in his district in Texas, including Ward. Sharp also directed the agency managers in his district's (including Ward) working conditions. Sharp, along with Justin Ingram, personally terminated Ward in retaliation for refusing to sign a false affidavit in support of Defendants' overtime case in *Ferguson*. Upon information and belief, Sharp also exercised discretion over agency manager's compensation (including Ward) by requiring managers to transfer commissions from their book of business to new agent hires. Furthermore, upon information and belief, Sharp dictated the manner in which agency managers (including Ward) were to run the agency, including the relationship with the local Farm Bureau County Board and agent sales requirements. Upon

information and belief, Sharp maintains employment records, including email related to Ward and other agency managers.

7.      Defendant Texas Farm Bureau Business Corporation ("TFB Business Corp.") is a Texas corporation, which maintains a presence and corporate address in Waco, McLennan County, Texas 76712. According to the Texas Farm Bureau's "General Career Openings" webpage, it employs "over 820 individuals" in "three companies – Texas Farm Bureau, Texas Farm Bureau Business Corporation and Texas Farm Bureau Casualty Insurance Company." The webpage further describes TFB Business Corp. as "provid[ing] administrative support services to Texas Farm Bureau and its affiliated insurance companies." Defendant TFB Business Corp.. may be served with process by delivering a copy of the Summons and Complaint to its registered agent, being Si E. Cook, 7420 Fish Pond Road, Waco, Texas 76710-1010, or wherever else he may be found.

8.      According to the Texas Farm Bureau's "Company Information" webpage, its insurance companies include: (a) Texas Farm Bureau Casualty Insurance Company; (b) Texas Farm Bureau Mutual Insurance Company; (c) Texas Farm Bureau Underwriters; (d) Farm Bureau County Mutual Insurance Company of Texas; and (e) Southern Farm Bureau Life Insurance Company.[1] Texas Farm Bureau utilizes letterhead listing these five companies under the umbrella of the "Texas Farm Bureau Insurance Companies."

---

[1] *See* https://www.txfb-ins.com/about-us/company-information (retrieved May 21, 2019).

9.      Defendants' website further represents that Defendants are "Headquartered in Waco, Texas," and the "[l]argest Texas-based insurance provider of auto, home/property, farm/ranch, life, and health insurance." [2]

10.     Defendant Texas Farm Bureau Casualty Insurance Company ("TFB Casualty"), is a Texas insurance company, which provides auto insurance policies and maintains a presence and corporate address in Waco, McLennan County, Texas 76712. Pursuant to Texas Insurance Code § 804.101(b), Defendant TFB Casualty may be served with process by delivering a copy of the Summons and Complaint to the president, an active vice president, secretary or attorney in fact at Defendant TFB Casualty's home office or principal place of business, being 7420 Fish Pond Road, Waco, Texas 76710, or leaving a copy of the process at the same during regular business hours.

11.     Defendant Texas Farm Bureau Mutual Insurance Company ("TFB Mutual") is a Texas insurance company, which provides home/property insurance policies and maintains a presence and corporate address in Waco, McLennan County, Texas 76712. Pursuant to Texas Insurance Code § 804.101(b), Defendant TFB Mutual may be served with process by delivering a copy of the Summons and Complaint to the president, an active vice president, secretary or attorney in fact at Defendant TFB Mutual's home office or principal place of business, being 7420 Fish Pond Road, Waco, Texas 76710, or leaving a copy of the process at the same during regular business hours.

12.     Defendant Texas Farm Bureau Underwriters ("TFB Underwriters") is a Texas entity providing insurance services, which underwrites insurance policies issued by the other

---

[2] *See* https://www.txfb-ins.com/about-us/company-information (retrieved May 21, 2019).

Defendants and maintains a presence and corporate address in Waco, McLennan County, Texas 76712. Pursuant to Texas Insurance Code § 804.101(b), Defendant TFB Underwriters may be served with process by delivering a copy of the Summons and Complaint to the president, an active vice president, secretary or attorney in fact at Defendant TFB Underwriters' home office or principal place of business, being 7420 Fish Pond Road, Waco, Texas 76710, or leaving a copy of the process at the same during regular business hours.

13.     Defendant Farm Bureau County Mutual Insurance Company of Texas ("FB County Mutual") is a Texas insurance company, which provides insurance policies and maintains a presence and corporate address in Waco, McLennan County, Texas 76712. Pursuant to Texas Insurance Code § 804.101(b), Defendant FB County Mutual may be served with process by delivering a copy of the Summons and Complaint to the president, an active vice president, secretary or attorney in fact at Defendant FB County Mutual's home office or principal place of business, being 7420 Fish Pond Road, Waco, Texas 76710, or leaving a copy of the process at the same during regular business hours.

14.     Defendant Southern Farm Bureau Life Insurance Company ("SFB Life") is a Mississippi insurance company, which provides life insurance policies and maintains a presence and corporate address in Waco, McLennan County, Texas 76712. Defendant SFB Life may be served with process by delivering a copy of the Summons and Complaint to its registered agent, being Bo Wilburn, 7420 Fish Pond Road, Waco, Texas 76710-1010, or wherever else he may be found.

15.     Defendant Texas Farm Bureau ("TFB") is a Texas corporation, which maintains a presence and corporate address in Waco, McLennan County, Texas 76712. According to its

website, TFB "is a membership association led by elected volunteers who are agricultural producers," and "[m]embers from each of the 13 statewide districts nominate a State Director to represent their geographic area on the Board of Directors." Defendant TFB may be served with process by delivering a copy of the Summons and Complaint to its registered agent, being Si E. Cook, 7420 Fish Pond Road, Waco, Texas 76710-1010, or wherever else he may be found.

## DEFENDANTS FORM A SINGLE ENTERPRISE AND ARE JOINT EMPLOYERS

16.     The Defendants all form a single enterprise under 29 U.S.C. § 203(r) because they perform related activities for a common business purpose.

17.     Each Defendant engages in activities relating to selling and servicing insurance policies under the Texas Farm Bureau aegis.

18.     Defendants Sloan Brown, Justin Ingram, and Jon Sharp were all supervisors of Ward. Each had hiring and firing power over agency managers like Ward. Indeed, Ingram and Sharp personally terminated her. Upon information and belief, all three collectively made the decision to terminate Ward in retaliation for her refusal to sign a false affidavit in support of Defendants overtime case in *Ferguson*.

19.     Texas Farm Bureau utilizes letterhead listing (a) Texas Farm Bureau Casualty Insurance Company; (b) Texas Farm Bureau Mutual Insurance Company; (c) Texas Farm Bureau Underwriters; (d) Farm Bureau County Mutual Insurance Company of Texas; and (e) Southern Farm Bureau Life Insurance Company under the umbrella of the "Texas Farm Bureau Insurance Companies."  These companies are engaged in the selling and servicing of insurance policies in Texas.

8

20.     All of the Defendants operate out of 7420 Fish Pond Road, Waco, Texas 76710-1010. The Defendants keep records relating to each company and the entire enterprise at this location.

21.     The Defendants operate subject to common management and control. According to Texas Secretary of State records and their website, Defendants share several officers and directors, including, but not limited to, Russell W. Boening, President & Treasurer; Bob Reed, Director; Vernie R. Glasson, Chief Operating Officer; and Cyndi Gerik, Chief Financial Officer & Comptroller.

22.     The Defendants have a unified operation, with each of the entities working together to offer different kinds of insurance in the Texas market under a single Texas Farm Bureau identity.

23.     The Defendants engaged in complementary businesses and were to a significant degree operationally interdependent. Agency Managers worked for all the Defendants, selling insurance lines from all the companies simultaneously. Advertising was under the joint Texas Farm Bureau logo, as were business cards issued to the Agency Managers. Agency Managers had @txfb-ins.com email addresses. Each of the Defendants cooperated to offer different lines of insurance under a single brand.

24.     Relations with the non-profit Farm Bureau arm were equally intertwined. Indeed, the Polk County Farm Bureau Board Members were charged with interviewing and ultimately approving agency managers for Polk County, including Ward.

25.     Defendants are an integrated enterprise and joint employers of Ward.

26. Defendants, formally or as a matter of practice, jointly determine, share, or allocate the ability to direct, control, or supervise Ward, by both direct and indirect means. For example, Ward and other misclassified Agency Managers were supervised by District Sales Managers who were responsible for managing the sales program for all product lines sold by the Defendants. District Sales Managers communicated corporate initiatives, procedures, and guidelines to Ward and other misclassified Agency Managers. Likewise, the same managers and supervisors who oversaw Ward regarding policies issued by Texas Farm Bureau companies, supervised them for life policies issued by Southern Farm Bureau Life Insurance Company.

27. Defendants, formally or as a matter of practice, jointly determine, share, or allocate the power to—directly or indirectly—hire or fire Ward or modify the terms or conditions of her employment.  For example, Ward was subject to employment-related agreements with each of the Defendants whereby the Defendants misclassified her as an independent contractor. These agreements required Ward to follow guidelines, instructions, or rules contained within the companies' rate books, compliance manuals, and guidelines, which were subject to change at the Defendants' sole discretion. These same agreements reserve the Defendants' right to terminate Ward at will.

28. The relationships between all of the Defendants is permanent and longstanding.

29. The day-to-day experience of Ward was that "Texas Farm Bureau" (as listed on their letterhead) was her employer, and the distinctions between the various entities under the TFB umbrella were fairly meaningless to Ward.  For example, supervisors and managers would be described as working for "Texas Farm Bureau" and managed Ward concerning all the

10

insurance lines sold, including all Texas Farm Bureau lines as well as life insurance sold by Southern Farm Bureau Life Insurance Company.

30.     Likewise, the nonprofit Farm Bureau arm was integrally incorporated into the innerworkings of the Polk County Farm Bureau insurance business. For example, the nonprofit arm executives or board members had ultimate hiring power over agency managers for Polk County, including Ward.

31.     Ward received pay from the Texas Farm Bureau entities and Southern Farm Bureau Life Insurance Company. Facilities, computers, and other office supplies were supplied by Defendants and used for all work done by Ward.

## FLSA COVERAGE

32.     At all material times, Defendants were employers within the meaning of the FLSA. *See* 29 U.S.C. § 203(d).

33.     Defendants controlled the nature, pay structure, and employment relationship of Ward.

34.     Defendants had, at all times relevant to this lawsuit, the authority to hire and fire Agency Managers, the authority to direct and supervise the work of Agency Managers, the authority to sign on the companies' checking accounts, including payroll accounts, and the authority to make decisions regarding Agency Managers' compensation and capital expenditures. Additionally, Defendants were responsible for the day-to-day affairs of the business. In particular, Defendants were responsible for determining whether they complied with the FLSA.

35.     As such, pursuant to 29 U.S.C. § 203(d), Defendants acted directly or indirectly in the interest of Ward's employment as their employer, which makes Defendants liable under the FLSA.

36.     Furthermore, at all material times, Defendants have been an enterprise in commerce or in the production of goods for commerce within the meaning of § 203(s)(1) of the FLSA because they have had employees engaged in commerce.  *See* 29 U.S.C. § 203(s)(1).

37.     Defendants engaged in related activities performed through a unified operation and common control for a common business purpose.

38.     Defendants have had, and continue to have, an annual gross business volume in excess of $500,000.

39.     At all material times, Ward was an employee engaged in commerce or in the production of goods for commerce as required by *See* 29 U.S.C. §§ 206–207.

### WARD WAS MISCLASSIFIED AS AN INDEPENDENT CONTRACTOR

40.     As described in this pleading, Ward was supervised, managed, and employed by "Texas Farm Bureau," an enterprise comprised of several different companies or divisions. There was no distinction made between any of the Defendants with regard to employment of Ward in that all of the Defendants comprised "Texas Farm Bureau" as Ward's employer, and all had control over the scheduling, pay, continued employment, and job duties of Ward.

41.     Ward was directly managed on a day-to-day basis by Defendants Sloan Brown, Justin Ingram, and Jon Sharp. Each also had hiring and firing power over her.

42.     Ward sold insurance and supervised insurance agents on behalf of Defendants.

43.     Ward's managers and supervisors were Defendants Sloan Brown, Justin Ingram, and Jon Sharp, all employees of Defendants.

44.     These managers and supervisors had the authority to hire and fire Agency Managers like Ward on behalf of Defendants. In fact, supervisors and managers did hire and fire Agency Managers like Ward on behalf of Defendants.

45.     The managers and supervisors had the authority to supervise Ward, to control schedules and conditions of employment on behalf of "Texas Farm Bureau", Texas Farm Bureau Casualty Insurance Company, Texas Farm Bureau Mutual Insurance Company, Texas Farm Bureau Underwriters, Farm Bureau County Mutual Insurance Company of Texas, and Southern Farm Bureau Life Insurance Company. In fact, supervisors and managers did control the schedules of Agency Managers, and the conditions of employment on behalf of Defendants.

46.     Ward and other misclassified Agency Managers were subject to employment-related agreements between themselves and Texas Farm Bureau Mutual Insurance Company and Texas Farm Bureau Underwriters; themselves and Texas Farm Bureau Casualty Insurance Company and Farm Bureau County Mutual Insurance Company of Texas; and themselves and Southern Farm Bureau Life Insurance Company.

47.     These agreements provide that Ward is subject to the guidelines, instructions, or rules contained within the companies' rate books, compliance manuals, and guidelines, which were subject to change at the sole discretion of the companies.

48.     These same agreements reserve the right to the companies to terminate Ward.

49.     These agreements reserve control over the rate and method of payment to the companies. The companies can modify their obligations of payment by adjusting rate schedules and the like at any time.

50.     Defendants maintain employment records relating to Ward.

## FACTS

### A.  Commissions Only

53.     As an Agency Manager, Ward was not paid any base salary, and instead, was paid exclusively commissions without any predetermined guaranteed minimum pay per week.

54.     When she was first promoted to the Agency Manager position in May 2016, Ward's offer letter stated that she was to be paid only commissions with no guaranteed minimum rate of base pay.

55.     Defendants made no payroll tax or other withholdings from the commissions paid to Ward and reported her income to the IRS by Form 1099 instead.

56.     In connection with her employment with Defendants as an Agency Manager, Ward would receive two 1099 forms for the reporting of her income to the IRS—one issued by TFB Casualty and the other SFB Life.

### B.     Long-Term Tenure Contemplated.

57.     Ward was hired by Defendants as an agent in January 2014 for Medina County, Texas.

58.     Ward was first promoted to Agency Manager in May 2016.

59.     She was moved to Polk County, Texas as an Agency Manager in October 2016.

The standard contracts she was required to sign in connection with her transfer explicitly contemplated a long-term period of employment (inconsistent with a bona fide independent contractor classification), providing, for example, that termination benefits were based on "Length of Continuous Service as agency manager" with graduating percentages depending upon whether "Continuous Service" was "Less than 5 years," "At least 5 but less than 6 years," "At least 6 but less than 7 years," "At least 7 but less than 8 years," "At least 8 but less than 9 years," "At least 9 but less than 10 years," or "At least 10 years."

60.     In this regard, a December 2014 Memorandum issued to all "Employees, Agency Managers, Agents, and CFB Secretaries" to announce the promotion of Sloan Brown to Vice President of Sales effective January 1, 2015, describes his "career" with Defendants starting as an agent in 1993, "tenure" for "three years as Agency Manager," followed by employment as a District Sales Manager from 2000 until he was promoted in 2011 to an Associate State Sales Director position.

## C.     Exclusive Relationship.

61.     Defendants' standard contracts for Ward also required that she work exclusively for Defendants (inconsistent with a bona fide independent contractor classification) and could "represent insurance companies in the state of Texas, other than Companies, only after receiving prior written consent of the Companies to do so."

62.     Defendants' standard contracts for Ward also included 2-year/50-mile radius non-compete and non-solicitation of agents and other Agency Managers following termination of employment (inconsistent with a bona fide independent contractor classification).

15

**D.      No Sub-Contracting**

63.     Defendants' standard contracts for Ward also provided that she could not sub-contract or assign any duties under the contracts "except with prior written consent of the [Companies/Company]" (inconsistent with a bona fide independent contractor classification). Thus, all services provided for Defendants by Ward were required by Defendants to be performed by her personally.

**E.      Issued Business Cards.**

64.     Defendants issued business cards to Ward (inconsistent with a bona fide independent contractor classification).

**F.      Closely Supervised By District Sales Managers.**

65.     Ward was closely supervised by Jon Sharp, her District Sales Manager who was employed by Defendants (inconsistent with a bona fide independent contractor classification).

66.     Job postings on Defendants' website for a career as a District Sales Manager include as "Major Responsibilities," "Responsible for *training and managing agency managers* in all lines of business, *including adherence to Companies' office procedures*," "*Approve account assignments to* agents and *agency managers*," "*Conduct no more than six district sales meetings per year and agency manager meetings* as deemed necessary from specified agendas determined by the Associate State Sales Directors and Vice President of Sales," "*Conduct in-depth quarterly meetings with each agency manager* in district *to review company goals, agency targets, agent training, manpower needs and office procedures*," "*Make weekly*

*site visits* to the agencies as determined by the Associate Sales Directors."  (Emphasis added.)

67.     Defendants required Ward to provide weekly and monthly reports to her District Sales Manager.

68.     Ward received performance evaluations from Defendants' managers and supervisors.

**G.     Issued Company E-mail Account.**

69.     Defendants issued Ward a company e-mail account (inconsistent with a bona fide independent contractor classification).

70.     Ward held herself out to the public as affiliated with Defendants, including, for example, listing the company in her e-mail signature blocks.

**H.     Forced Vendor Contract With County Board and Resulting Pay Deductions.**

71.     When Ward was first promoted to the Agency Manager position in May 2016, Defendants required her to enter into a separate "Memorandum of Understanding" with the County Farm Bureau for their particular County and maintain a "good relationship with the County Board [and its] secretaries.".

72.     Under these requisite contracts, Ward was forced to obtain from the County Board at designated costs her (a) office space, (b) furniture, (c) local telephone service, (d) office supplies, (e) copy and fax machines and paper for same, (f) secretaries; and (g) other clerical assistants and insurance service representatives ("ISR's").

73.     Defendants would make payroll deductions from Ward's commission earnings to pay these required expenses.

17

74.     Defendants also made payroll deductions from Ward's commissions for laptop "lease" and internet access expenses.

**I.      Deductions for TFB's Severance Obligations to Former Agency Managers.**

75.     Defendants would make payroll deductions from the commission earnings of Ward for "buy outs" to the former Agency Managers Ward and others replaced (regardless of the reason the former Managers were terminated—including terminations for fraud).

76.     These "buy outs" were Defendants' severance obligations to their former Agency Managers that Defendants' required Ward and other similarly situated Agency Mangers to pay instead of Defendants' honoring these obligations.

**J.      Primary Job Duties.**

77.     The services provided by Ward and the other similarly situated Agency Managers were integrated into Defendants' business operation of selling insurance policies (inconsistent with a bona fide independent contractor classification).

78.     The primary job duties of Ward and the other similarly situated Agency Managers was to sell insurance, recruit insurance agents, and supervise insurance agents for Defendants whom Defendants classified as independent contractors.  The vast majority of these duties were performed inside the office space Ward was required to lease from Defendants.

79.     Namely, Ward would solicit sales of the various insurance products provided by Defendants and service those sales.

80.     Ward would also assist other agents in her office solicit sales of the various insurance products provided by Defendants and service those sales

18

81.     Ward was also required to remit money received and collected from customers to Defendants.

82.     Ward was required to report customer insurance claims and deliver relevant claim information to Defendants' adjusters or authorized representatives.

**K.      Substantial Overtime Worked Without Overtime Pay.**

83.     Ward typically worked over 40 hours each workweek, with overtime hours estimated at a minimum of five hours during slow weeks to upwards of about 25 hours per week during busy weeks.

84.     Notwithstanding the fact Ward was paid exclusively commissions with no guaranteed salary and had non-exempt job duties as her primary duties, Defendants never paid her any overtime pay.

85.     Defendants knew they were required by the FLSA to pay an additional one and one-half premium rate for the overtime work of Ward.

86.     Defendants willfully failed to pay Ward any overtime. The failure to pay overtime was a violation of the FLSA, including §§ 207(a) and 15(a)(2).

**L.      Defendants terminate Ward in retaliation for refusing to sign a "happy camper" affidavit filled with untrue statements, which supported Defendants' opposition to the motion for conditional certification in _Ferguson_.**

87.     A substantially related case involving the same Defendants is pending in the Western District of Texas, _Ferguson v. Texas Farm Bureau, et al._, Cause No. 6:17-cv-111-RP. That case involves a group of agency managers, like Ward, alleging they were misclassified as exempt independent contractors and not paid overtime. In May 2017, these _Ferguson_ plaintiffs

moved to conditionally certify a collective action against Farm Bureau on behalf of agency managers.

88.     As an agency manager, Ward had personal knowledge of the working conditions agency managers endure at Farm Bureau and was a member of the class the *Ferguson* plaintiffs had moved to conditionally certify. Thus, Ward was not only a potential party to that case but also an actual witness.

89.     Farm Bureau agreed.

90.     On June 23, 2017, Ward received an email around 3:00 p.m. with a draft affidavit enclosed requesting that it be signed and returned by 5:00 p.m.

91.     Ward received the email from one of her superiors.

92.     The draft affidavit was sent to numerous Agency Managers and was to be used by Defendants to oppose conditional certification and certain claims asserted by the Plaintiffs in *Ferguson*.

93.     Ward felt she was being pressured and intimidated to sign this affidavit given Defendants demanded that she review and sign very quickly.[3]

94.     Ward reviewed the affidavit and determined that several facts asserted in the affidavit were untrue.

95.     Ward therefore refused to sign the affidavit.

96.     Shortly after Defendants learned Ward had refused to sign the affidavit, Ward received a call from Bill Bergman. Bergman is a board member of the TFB Polk County Board.

---

[3] Defendants' pressure tactic in obtaining these happy camper affidavits was addressed by Judge Pittman (*See* Dkt. 109 (transcript of July 13, 2017 hearing) resulting in corrective notice. (*See* Dkt. 136).

Bergman informed Ward that certain executives of Defendants stated to him that if she did not sign the affidavit, her employment would be terminated in 30 days.

97.     Immediately after refusing to sign the affidavit, Ward noticed her immediate supervisor, Defendant Jon Sharp , began treating her differently.

98.     Before the affidavit incident, Sharp routinely called Ward's cell phone to discuss business.  That stopped immediately after Ward refused to sign the affidavit.  Sharp would only call Ward's office line as a way of putting Ward under a microscope to check on when she was working in the office.

99.     About 35 days after she refused to sign the affidavit, Defendants made good on their threat of retaliation and terminated Ward's employment.

100.    Ward was terminated by Defendants Sharp and Ingram .

101.    When asked by Ward what were the grounds for her termination, Ingram stated that there was no cause and refused to elaborate.

### COUNT I: FLSA RETALIATION

102.    Ward incorporates all allegations contained in this pleading.

103.    Defendants have violated Section 15(a)(3) of the FLSA, 29 U.S.C. §215(a)(3), by retaliating against Ward and interfering with her rights under the FLSA, including:

a.     Pressuring and intimidating Ward to quickly sign a false affidavit used by Defendants for their defense of the *Ferguson* FLSA collective action;

b.     Threatening Ward that she would be terminated in 30 days if she refused to sign a false affidavit used by Defendants for their defense of the *Ferguson* collective action; and

c.     Terminating Ward's employment with Defendants because she refused to sign a false affidavit used by Defendants for their defense of the *Ferguson*

collective action.

104.    The FLSA's antiretaliation provision prohibits Defendants from extracting coerced declarations from employees like Ward in these ways. Such tactics deter employees like Ward from participating in an ongoing investigation or litigation since they may believe that the coerced declarations could later be used against them to claim that they perjured themselves.

105.    Defendants' violations of the antiretaliation provision of the FLSA were willful or intentional as Defendants knew their coercive, threatening, intimidating acts and retaliatory discharge against Ward violates the FLSA.

106.    Due to this retaliatory discharge, Ward has lost wages and suffered emotional distress and mental anguish.

107.    Defendants are liable to Ward for her reasonable attorneys' fees and costs.

## COUNT II: VIOLATION OF 29 U.S.C. § 207

108.    Ward incorporates all allegations contained in this pleading.

109.    Defendants' practice of failing to pay Ward time-and-a-half rate for hours in excess of 40 per workweek violates the FLSA. *See* 29 U.S.C. § 207.

110.    None of the exemptions provided by the FLSA regulating the duty of employers to pay overtime at a rate not less than one and one-half times the regular rate at which its employees are employed are applicable to the Defendants or Ward

## COUNT III: VIOLATION OF 29 U.S.C § 211(c)

111.    Ward incorporates all allegations contained in this pleading.

112.    Defendants failed to keep adequate records of Ward's work hours and pay in violation of section 211(c) of the FLSA. *See* 29 U.S.C. § 211(c).

113.    Federal law mandates that an employer is required to keep for three years all payroll records and other records containing, among other things, the following information:

        a.    The time of day and day of week on which the employees' work week begins;

        b.    The regular hourly rate of pay for any workweek in which overtime compensation is due under section 7(a) of the FLSA;

        c.    An explanation of the basis of pay by indicating the monetary amount paid on a per hour, per day, per week, or other basis;

        d.    The amount and nature of each payment which, pursuant to section 7(e) of the FLSA, is excluded from the "regular rate";

        e.    The hours worked each workday and total hours worked each workweek;

        f.    The total daily or weekly straight time earnings or wages due for hours worked during the workday or workweek, exclusive of premium overtime compensation;

        g.    The total premium for overtime hours. This amount excludes the straight-time earnings for overtime hours recorded under this section;

        h.    The total additions to or deductions from wages paid each pay period including employee purchase orders or wage assignments;

        i.    The dates, amounts, and nature of the items which make up the total additions and deductions;

        j.    The total wages paid each pay period; and

        k.    The date of payment and the pay period covered by payment.

23

*See* 29 C.F.R. §§ 516.2, 516.5.

114.    Defendants have not complied with federal law and have failed to maintain such records with respect to Ward. Because Defendants' records are inaccurate and inadequate, Ward can meet her burden under the FLSA by proving that she, in fact, performed work for which she was improperly compensated, and producing sufficient evidence to show the amount and extent of the work "as a matter of a just and reasonable inference." *See, e.g.*, *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946).

## WILLFULLNESS

115.    Defendants' method of paying Ward in violation of the FLSA was willful and was not based on a good faith and reasonable belief that their conduct complied with the FLSA.

116.    Defendants were aware of the FLSA's requirement that "all non-exempt employees be paid 'time and a half' their regular rate of pay for all hours worked in excess of 40 hours in a seven-day week" as evidenced by a 2014 PowerPoint presentation given to Agency Managers by Defendants.

117.    Defendants were aware of the specific job duties of the Agency Managers, and were aware that those duties did not fit within any exemption to the FLSA's requirement for overtime pay.

118.    Defendants knew that the position of Agency Manager as the job was intended and was performed by Ward was consistent with an employment relationship under the FLSA and that it would be improper to classify the Agency Managers as independent contractors.

119.    Defendants knew or showed reckless disregard for the proper classification of

Ward when they classified her as an exempt independent contractor.

120.   Defendants willfully misclassified Ward's position as exempt.

121.   Defendants are liable to Ward for the difference between what Defendants actually paid her and what Defendants were legally obligated to pay her.

122.   Because Defendants knew or showed a reckless disregard for whether their pay practices violated the FLSA, Defendants owe Ward unpaid overtime wages for at least the last three years.

123.   Defendants are liable to Ward in an amount equal to her unpaid overtime wages as liquidated damages.

124.   Defendants are liable to Ward for her reasonable attorneys' fees and costs.

## JURY DEMAND

125.   Ward hereby demands a jury trial.

## PRAYER

126.   For these reasons, Ward respectfully requests that judgment be entered against Defendants jointly and severally in Ward's favor awarding the following relief and damages:

a)   a judgment awarding Ward overtime compensation for all hours worked over 40 in a workweek at the applicable time-and-a-half rate;

b)   an equal amount of all owed wages as liquidated damages as allowed under the FLSA;

c)   lost wages and liquidated damages equal to the lost wages pursuant to 29 U.S.C.A. § 216(b);

d)   future lost wages as front pay pursuant to 29 U.S.C.A.§ 216(b);

e)      compensatory damages including but not limited to damages for mental anguish and emotional distress;

f)      pre-judgment interest;

g)      punitive damages for Defendants' intentional act of retaliatory discharge in express violation of section 15(a)(3) of the FLSA;

h)      all costs and attorney's fees incurred prosecuting these claims; and

i)      such other relief to which Ward may be entitled, at law or in equity.

Respectfully submitted,

**WILLIAMS HART BOUNDAS
EASTERBY, LLP**

By: ____/s/ *John Eddie Williams Jr.*_____
        John Eddie Williams, Jr.
        Texas Bar No. 21600300
        S.D. Tex. Bar No. 5179
        jwilliams@whlaw.com
        Brian A. Abramson
        Texas Bar No. 24050193
        S.D. Tex. Bar No. 634741
        babramson@whlaw.com
        Sean M. McCarthy
        Texas Bar No. 24065706
        S.D. Tex. Bar No. 987779
        smccarthy@whlaw.com
        8441 Gulf Freeway, Suite 600
        Houston, Texas 77017
        Telephone:  713-230-2200
        Facsimile:  713-643-6226

**WYLY & COOK, PLLC**

By:   _/s/ Kelly E. Cook_
Kelly E. Cook
kcook@wylycooklaw.com
State Bar No. 24062675
S.D. Tex. Bar No: 1022069
Warren A. Berlanga
wberlanga@wylycooklaw.com
State Bar No. 24085199
S.D. Tex. Bar No: 2611869
4101 Washington Ave. 2nd Floor
Houston, TX 77007
Telephone: (713) 236-8330
Facsimile: (713) 863-8502

**MCDOWELL HETHERINGTON LLP**

By:   _/s/ Avi Moshenberg_
Avi Moshenberg
Texas Bar No.: 24083532
avi.moshenberg@mhllp.com
Nick Lawson
Texas Bar No.: 24083367
nick.lawson@mhllp.com
William B. Thomas
Texas Bar No.: 24083965
william.thomas@mhllp.com
1001 Fannin, Suite 2700
Houston, Texas 77002
Telephone: 713-337-5580
Fax: 713-337-8850

**ATTORNEYS FOR PLAINTIFF LINDSAY WARD**